UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
KIMBERLY SMITH,                         )
          Plaintiff                     )
                                        )        CIVIL ACTION
          v.                            )        NO. 09-11548-WGY
                                        )
MICHAEL J. ASTRUE,                      )
Commissioner, Social Security           )
Administration,                         )
          Defendant.                    )
_____)

MEMORANDUM OF DECISION

YOUNG, D.J.                                          June 11, 2010

## I.   INTRODUCTION

     The plaintiff Kimberly Smith ("Smith") seeks to have this
Court reverse the decision of Michael J. Astrue, Commissioner of
the Social Security Administration ("Commissioner"), denying her
application for Social Security Disability Benefits.  Pl.'s Mot.
Reverse Decision of Commissioner ("Pl.'s Mot.") [Doc. No. 12].
The Commissioner moves for an order affirming the final decision
of the hearing officer.  Def.'s Mot. Order Affirming Decision of
Commissioner ("Def.'s Mot.") [Doc. No. 15].

### A.   Procedural Posture

     On March 23, 2007, Smith filed an application for Social
Security Disability Benefits.  Administrative Transcript ("Adm.
R.") at 7.  In that application, Smith alleged disability

1

beginning September 1, 2003.  Id.  The claim was denied at the initial level of review on June 20, 2007.  Id.  Smith thereafter appealed the decision to a Federal Reviewing Official, who subsequently denied the claim on February 11, 2008.  Id.  As a result, Smith promptly requested and was granted an oral hearing on February 17, 2009, in Providence, Rhode Island.  Id.

On April 1, 2009, the hearing officer rendered an unfavorable decision which was selected by the Decision Review Board (the "Board") for evaluation.  Id. at 4.  Because the Board failed to take action on Smith's claim within ninety days of the unfavorable decision, the hearing officer's decision became the final decision of the Social Security Administration, id., thus rendering the matter amenable to judicial review.  See 42 U.S.C. § 405(g) ("Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . .").

On September 15, 2009, Smith appealed the hearing officer's decision to this Court by filing a complaint against the Commissioner.  Compl. at 1 [Doc. No. 1].  On December 4, 2009, the Commissioner filed his answer to Smith's complaint.  Answer [Doc. No. 9].  On December 7, 2009, this Court allowed an

assented to motion for leave to file the Administrative
Transcript in non-electronic, unredacted form.  On January 11,
2010, Smith submitted a motion asking this Court to reverse the
decision of the Commissioner, Pl.'s Mot., which was supported by
an accompanying memorandum of law, Pl.'s Mem. Supp. Mot. Reverse
("Pl.'s Mem.") [Doc. No. 13].  On March 24, 2010, the
Commissioner responded by submitting a motion for an order
affirming his decision, Def.'s Mot., together with a memorandum
of law in support thereof, Def.'s Mem. Supp. Mot. Order Affirming
Decision of Commissioner ("Def.'s Mem.") [Doc. No. 16].

B.   **Facts**

Smith claims the primary reason she is unable to work is due
to her mental disabilities.  Adm. R. at 127.  She lists her
mental disabilities as bipolar disorder and anxiety.  Id.  At the
time of Smith's original hearing, she was a thirty-six year old
woman with a high school education, vocational training, and was
certified in information processing.  Id. at 29.  She has
previous work experience as a waitress, cashier, operating
engineer in construction, as well as a shipper/receiver.  Id. at
108-15.  Smith has not engaged in substantial gainful activity
since September 1, 2003 (her alleged date of onset).  Id. at 9.
After the alleged onset date of disability, Smith attempted to
work at several jobs but ultimately was unsuccessful.  Id.
Therefore, such work did not rise to the level of substantial

gainful activity.  Id.

The evidence of record suggests that prior to 2004, Smith received psychiatric treatment for depressive and anxious symptoms stemming from the birth of her son.  Id. at 178, 185. In March 2004, Smith submitted to an initial psychiatric evaluation at Arbour Counseling Services, where she explained that she did not have any friends, and complained of diminished interest in activities, irritability, as well as sleep loss.  Id. at 178-82.

Smith was hospitalized from March 10-16, 2004, at Westwood Lodge Hospital after a psychotic episode during which she attempted to climb from her bedroom window, stated a desire to crash her automobile, and expressed plans to inflict harm upon her children.  Id. at 175.  A mental status examination conducted during Smith's stay revealed that her mood improved since she had been admitted, that she had no delusions or hallucinations, and that she was oriented as to person, place, and time.  Id. at 176. As such, she was discharged with prescriptions for lithium, trazodone, klonopin, zyprexa, depakote, and inderal.  Id.

In May 2004, Smith reported to the emergency room at Sturdy Memorial Hospital complaining of tremors, difficulty sleeping, and shortness of breath.  Id. at 218.  Dr. Hung Nguyen, the emergency physician, attributed Smith's symptoms to withdrawal from klonopin, and therefore prescribed a tapered dose of

klonopin going forward.  Id. at 219.

   In July 2006, Smith began receiving psychiatric treatment
from Dr. Shalini Mansharamani ("Dr. Mansharamani").  Id. at 301.
Although Dr. Mansharamani described Smith as disheveled and
anxious, she concluded that Smith's bipolarity was in remission.
Id. at 303.  During a follow up visit in August 2006, Dr.
Mansharamani described Smith as "doing well, having lost [twelve]
pounds."  Pl.'s Mem. at 5.  In November 2006, Dr. Mansharamani
again noted that Smith's condition was improving and that she
kept herself busy by doing chores around the house.  Adm. R. at
306.

   After an office visit in October 2007, Dr. Mansharamani
noted that Smith was not doing well and spent most of her time in
bed.  Id. at 350.  Dr. Mansharamani adjusted her medications
accordingly, and approximately two weeks later Smith reported
that she was feeling better.  Id. at 351.

   Smith subsequently discontinued care with Dr. Mansharamani,
Pl.'s Mem. at 6, and began receiving treatment from Dr. Karen
Trevisan ("Dr. Trevisan") on April 17, 2008.  Adm. R. at 386.
Dr. Trevisan observed that Smith suffered from signs of moderate
depression and diagnosed her with bipolar disorder.  Id. at 387-
88.  During a subsequent visit in November 2008, Dr. Trevisan
completed a psychiatric review technique form in which she opined
that Smith suffered from a severe impairment, but that such

impairment was not expected to remain longer than twelve months. Id. at 403.  Still, Dr. Trevisan noted that Smith's response to medication was only moderate, and that her anxiety, obsessiveness, and irritability still imposed daily limitations. Id. at 408.

At the original hearing, Smith testified that her lack of work could be attributed to her tremors, obsessive compulsive disorder, anxiety, as well as panic attacks, and that her medications constantly left her exhausted.  Id. at 33, 36. Additionally, Smith's husband testified that her condition has been a "steady down [sic] hill thing" since 2003.  Id. at 39.

Dr. Stuart Gitlow ("Dr. Gitlow"), a board certified psychiatrist, also testified at Smith's hearing.  Dr. Gitlow stated that Dr. Trevisan's conclusions about Smith's limitations were not supported by the mental status examination, which otherwise suggested that Smith was functioning appropriately. Id. at 24.  Moreover, Dr. Gitlow opined that after 2006, Smith generally was stable and suffered only minor limitations in her activities of daily living and social functioning.  Id. at 26.

The last witness to testify at Smith's hearing was Michael Laraya (the "Vocational Expert").  The Vocational Expert was of the opinion that a hypothetical claimant who could perform work at all exertional levels and suffered only moderate limitations in the maintenance of concentration and attention would have no

trouble performing work presently existing throughout the national economy.  Id. at 42.

### C.   Federal Jurisdiction

This Court may exercise subject-matter jurisdiction over the present case pursuant to the authority conferred upon it by 42 U.S.C. § 405(g) to hear appeals from final orders or decisions of the Commissioner of Social Security.

## II.  ANALYSIS

### A.   Standard of Review

Review of the Commissioner's decision is limited by section 405(g) of the Social Security Act, which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); see Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996).  The substantial evidence standard is satisfied where "a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the] conclusion."  Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  Furthermore, factual inferences, credibility determinations, and resolutions of conflicts in the evidence are reserved solely for the Commissioner.  Id.  Accordingly, this Court must affirm the

Commissioner's decision "even if the record arguably could
justify a different conclusion, so long as it is supported by
substantial evidence." Rodriquez Pagan v. Sec'y of Health &
Human Servs., 819 F.2d 1, 3 (1st Cir. 1987). "Even in the
presence of substantial evidence, however, the Court may review
conclusions of law, and invalidate findings of fact that are
derived by ignoring evidence, misapplying the law, or judging
matters entrusted to experts." Musto v. Halter, 135 F. Supp. 2d
220, 225 (D. Mass. 2001) (internal citations and quotation marks
omitted).

### B.   Social Security Disability Standard

As the claimant, Smith bears the initial burden of showing
that she is disabled within the meaning of the Social Security
Act.  Deblois v. Sec'y of Health & Human Servs., 686 F.2d 76, 79
(1st Cir. 1982).  An individual is considered disabled if she is
unable "to engage in any substantial gainful activity by reason
of any medically determinable physical or mental impairment which
can be expected to result in death or which has lasted or can be
expected to last for a continuous period of not less than 12
months."  42 U.S.C. § 423(d)(1)(A).

Evidence of impairment is not, by itself, sufficient to
warrant an award of Social Security Disability Benefits.  See
McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1120
(1st Cir. 1986).  The Social Security Act provides that "[a]n

individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."   42 U.S.C. § 423(d)(2)(A).

The Social Security Administration has promulgated a five-step sequential analysis for determining whether a claimant is disabled.  See 20 C.F.R. § 404.1520(a)(4)(i)-(v).  The hearing officer must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the impairment prevents the claimant from performing previous relevant work; and (5) whether the impairment prevents the claimant from doing any other work considering the claimant's age, education, and work experience.  Id.  If the hearing officer decides at any step of the evaluation that the claimant is or is not disabled, the analysis will not continue to the next step.  Id.

### C.   The Hearing Officer's Decision

The hearing officer made the following findings of fact and conclusions of law: (1) Smith meets the insured status requirements of the Social Security Act through March 31, 2010; (2) Smith has not engaged in substantial gainful activity since

September 1, 2003; (3) Smith suffers from bipolar disorder, a
medically determinable "severe" impairment; (4) the impairment
does not meet or medically equal one of the listed impairments in
Appendix 1 to Subpart P of Regulation No. 4 entitled "Listing of
Impairments"; and (5) Smith's testimony concerning the intensity,
persistence, and limiting effects of the symptoms she complained
of was not entirely credible in light of the medical evidence
presented, and Smith's own descriptions of her daily activities.
Adm. R. at 9-12.

On the basis of these findings, the hearing officer
determined that Smith was unable to perform any of her past
relevant work, but nevertheless concluded that she "retains the
residual functional capacity to perform a significant range of
work at all exertional levels, with . . . limitation in task
complexity due to diminished concentration, fatigue and other
symptoms reasonably resulting from her impairment and medication
[side] effects." Id. at 14.  The hearing officer therefore
found, in light of Smith's age, education, work experience, and
residual functional capacity, that there exists a significant
number of jobs in the national economy that she can perform. Id.
at 15.  Accordingly, the hearing officer concluded that Smith had
not been under a "disability," as defined by the Social Security
Act, from September 1, 2003, through the date of his decision.
Id. at 16.

   **D.   Challenges to the Hearing Officer's Decision**

   Smith advances three challenges to the hearing officer's
decision: the hearing officer (1) erred in his assessment of
Smith's credibility; (2) erred in rejecting the assessment of
Smith's treating physician; and (3) failed to consider all of
Smith's impairments in his evaluation of her residual functional
capacity and in the hypothetical question presented to the
Vocational Expert.  Pl.'s Mem. at 13, 16, 17.

      **1.   Assessment of Smith's Credibility**

   "It is the responsibility of the [hearing officer] to
determine issues of credibility and to draw inferences from the
record evidence."  <u>Ortiz</u>, 955 F.2d at 769.  When assessing
credibility, the hearing officer must consider all of the medical
evidence in the record, including the claimant's daily
activities; the location, duration, frequency and intensity of
any symptoms; factors which precipitate or aggravate the
symptoms; the type, dosage, effectiveness, and side effects of
any medications; medical treatment for symptoms; functional
restrictions, as well any other relevant factors.  <u>See</u> <u>Avery</u> v.
<u>Sec'y of Health & Human Servs.</u>, 797 F.2d 19, 22 (1st Cir. 1986).

   The First Circuit has explained that when a claimant's
testimony is discredited, the hearing officer "must make specific
findings as to the relevant evidence he considered in determining
to disbelieve the [claimant]."  <u>Da Rosa</u> v. <u>Sec'y of Heatlh &</u>

Human Servs., 803 F.2d 24, 26 (1st Cir. 1986).  When supported by

such substantial evidence, the reviewing court will defer to the

credibility determination of the hearing officer, "who observed

the claimant, evaluated [her] demeanor, and considered how that

testimony fit in with the rest of the evidence."  Frustaglia v.

Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir.

1987).

     At the hearing, Smith testified that she is unable to work

because she gets too anxious and develops tremors in her hands.

Adm. R. at 33.  Additionally, she testified that she has

obsessive compulsive disorder, difficulty concentrating,

intrusive thoughts, and suffers from panic attacks.[1]  Id.  In

assessing the credibility of Smith's testimony, the hearing

_____

     [1] The following is an excerpt directly from the
Administrative Transcript:

          [Hearing Officer]: I'd like you to tell me why
          you feel you're not able to do any kind of work
          now, even work that's less stressful than what
          you've done in the past.

          [Smith]: Why I can't work now?

          [Hearing Officer]: Uh-huh.

          [Smith]: I get at the job, I get anxious, I, I
          get tremors in my hands.  I get OCD, I have OCD,
          that interferes with my work.  And, I can't
          concentrate and I just get like panic attack, I
          have to go home, I just can't stay and I get the,
          the intrusive thoughts.

Adm. R. at 32-33.

officer explained that her medically determinable impairment reasonably could be expected to cause <u>some</u> of the symptoms of which she complained.  Adm. R. at 12.  He concluded, however, "that [Smith's] statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the . . . residual functional capacity assessment."  <u>Id.</u>  In his written decision, the hearing officer specifically noted the evidence upon which he relied in arriving at this conclusion.

First, the hearing officer pointed out that there was no medical evidence in the record to corroborate Smith's treatment for bipolarity prior to 2004.[2]  <u>Id.</u>  He then recognized that Smith had a psychotic episode for which she received emergency treatment at the Westwood Lodge on March 10, 2004, but nevertheless found that she responded positively to the treatment and that her mood improved as a result.  <u>See id.</u>  The hearing officer explained that since Smith was released from Westwood Lodge in March 2004, her medical records through 2008 revealed no serious mental status abnormalities.  <u>See id.</u> at 13.  Additionally, he observed that her mental functioning and cognitive abilities were stable.  <u>See id.</u>  On these bases, the

---

[2] The hearing officer recognized, however, that admission notes from Smith's emergency visit to Westwood Lodge on March 10, 2004 indicated that she was, at that time, being treated by a psychiatrist.  Adm. R. at 12.

hearing officer concluded that the evidentiary record as a whole
"reflects that [Smith] made a good recovery after March 2004, and
that her symptoms have been fairly well controlled when receiving
appropriate medical treatment, including medication management."
Id.

It cannot be said that the hearing officer's decision to
discredit Smith's testimony lacks sufficient evidentiary support.
As just explained, the hearing officer's decision rested upon
Smith's medical records, which showed improvements in Smith's
condition subsequent to her hospitalization, the relative
normalcy of her mental status examinations, as well as her
reported mental stability.  See id.  Moreover, the hearing
officer referenced the fact that the record was devoid of any
medical evidence confirming Smith's treatment for bipolar
disorder prior to 2004.  Id. at 12.  As a result, there is no
question that the hearing officer's decision was supported by
substantial evidence in the record.  Though a contrary decision
might reasonably have been reached in this case had Smith's
testimony been credited, it is not the function of this Court to
second-guess credibility assessments of the hearing officer that
are supported by sufficient evidence.  See Rodriguez, 647 F.2d at
222.  Accordingly, this Court will defer to the hearing officer's
evaluation of Smith's credibility.

### 2.   Weight Given to Opinion of Treating Physician

Though Smith's treating physician, Dr. Trevisan, did not offer testimony at the hearing, her medical reports are part of the evidentiary record before this Court.  These medical reports indicate Dr. Trevisan's conclusion that Smith's symptoms of bipolarity – anxiety, irritability, and obsessive traits – significantly impair her ability to function socially, as well as her concentration, persistence, and pace.  Id. at 413, 427. Still, Dr. Trevisan noted that Smith's "severe" condition could not be expected to last longer than twelve months.  Id. at 403.

Also included in the evidentiary record before this Court is the testimony of Dr. Gitlow, an impartial medical expert under contract with the Commissioner of the Social Security Administration.[3]  At the hearing, Dr. Gitlow testified that Smith "could reasonably be expected to experience some weight gain, sedation and fatigue as the result of taking Lithium, Zyprexa, Seroquel, Cymbalta and other medications."  Id. at 14, 26-27.  He concluded, however, that since May 2004, the record suggests that Smith's symptoms have been relatively mild.  Id. at 23-25.

---

[3] "Dr. Gitlow is Board-certified in psychiatry, has additional qualification in addiction medicine, and has published numerous articles and at least one book on the subject of substance use disorders.  He is recognized by the Commissioner of the Social Security Administration as an impartial medical expert, is familiar with the Social Security Administration's regulations regarding evaluation of disability, and is highly . . . qualified to offer medical opinion evidence on issues presented in this case."  Adm. R. at 14 n.1.

In his written decision, the hearing officer explicitly stated that he gave "great weight to the testimony and opinion of Dr. Gitlow[,]" while he gave "Dr. Trevisan's assessment . . . little weight." Id. at 14.  Smith argues that the hearing officer erred in rejecting the assessment of her treating physician, Dr. Trevisan.  Pl.'s Mem. at 16-17.  Specifically, she asserts that Dr. Trevisan's opinion is supported by Smith's extensive medical history and several failed attempts to sustain employment, even at low level jobs and for short periods of time. Id. at 17.

In deciding a claim for Social Security Disability Benefits, the hearing officer should lend "more weight to the opinions from [the claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's medical] medical impairments."  20 C.F.R. § 404.1527(d)(1).  Indeed, the hearing officer is bound to give controlling weight to the opinions of treating physicians if well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the record. Id. § 404.1527(d)(2).

The First Circuit expressly has stated, however, that the hearing officer "is not required automatically to give controlling weight to any 'treating' doctor's report."  Rivera v.

Sec'y of Health & Human Servs., No. 92-1896, 1993 WL 40850, at *3
(1st Cir. Feb. 19, 1993).  In fact, the First Circuit has
explained that a treating physician's report or opinion regarding
a claimant's inability to work, if unsupported by objective
medical evidence or is entirely conclusory, may be discredited by
the hearing officer.  See Keating v. Sec'y of Health & Human
Servs., 848 F.2d 271, 275-76 (1st Cir. 1988).

The hearing officer was acting well within his discretion
when he decided to discredit the opinion of Dr. Trevisan.  In his
decision, the hearing officer explained that he gave little
weight to Dr. Trevisan's assessment because her treatment notes
dated only two months prior to the hearing stated that Smith was
stable and had no mental status abnormalities.  Adm. R. at 14.
Additionally, he relied upon the fact that Dr. Trevisan's
treatment notes stated that Smith's "severe" impairment could not
be expected to last longer than twelve months.  Id. at 403.
Thus, the hearing officer concluded that Dr. Trevisan's
assessment was inconsistent both with her treatment notes as well
as Dr. Gitlow's testimony.  Id. at 14.

In short, it is clear that Dr. Trevisan's assessment of
Smith's condition was unsupported by objective medical evidence
and entirely conclusory.  Therefore, under applicable First
Circuit precedent, the hearing officer was free to attach
whatever weight he saw fit to Dr. Trevisan's opinion.

Accordingly, this Court will defer to the hearing officer's evaluation of the weight to be attached to Dr. Trevisan's assessment.

### 3.    Residual Functional Capacity Assessment & Hypothetical Question to Vocational Expert

At Smith's hearing, the Vocational Expert was called to testify.  See Adm. R. at 40.  During his testimony, the hearing officer asked the Vocational Expert to "consider a hypothetical claimant of the same age, education and work background as [Smith], with the residual functional capacity for work at all exertional levels, limited by . . . a moderate reduction in ability to maintain attention and concentration, . . . [but] requir[ing] work breaks on average every two hours."  Id. at 42. After presenting this scenario, the hearing officer proceeded to ask the Vocational Expert whether the hypothetical claimant would be able to engage in any of Smith's past relevant work, to which the Vocational Expert responded that she would not.  Id.

The hearing officer then asked the Vocational Expert whether, considering these same limitations, he could identify any jobs that the hypothetical claimant could perform.  Id.  In response to this question, the Vocational Expert explained that within the region of Rhode Island and southeastern Massachusetts, there were several "unskilled work positions" in which the

18

hypothetical claimant could engage.[4]  Id. at 42-43.

     After reviewing all the evidence of record, the hearing

officer adopted the opinion of the Vocational Expert and found

that Smith could no longer perform her past relevant work as a

waitress, cashier, operating engineer, or shipper/receiver.  Adm.

R. at 14.  At that point, the burden shifted to the Commissioner

"to establish that there are a significant number of jobs in the

national economy that [Smith] could perform."  Musto, 135 F.

Supp. 2d at 231 (citing Hernandez v. Weinberger, 493 F.2d 1120,

1122-23 (1st Cir. 1974)).  According to the hearing officer's

decision, this burden was satisfied by the testimony of the

Vocational Expert, who testified that Smith could perform a

variety of unskilled jobs at varying levels of exertion.  Adm. R.

at 42-43.  The hearing officer thus relied on the Vocational

---

     [4] The following is an excerpt directly from the
Administrative Transcript:

          [Hearing Officer]: Are you able to identify any
          jobs that could be performed within the
          constraints I've described?

          [Vocational Expert]: Yes, in this region, that
          being Rhode Island and southeastern
          Massachusetts, there are jobs that meet that
          hypothetical. For example, all unskilled, they
          would all be unskilled work positions, machine
          operators of which there are approximately 9,100;
          cleaning positions, approximately 30,000; some
          freight and stock material handler work, 3,700;
          there would be some assembly work, parts,
          approximately 7,000.

Adm. R. at 42-43.

Expert's testimony in arriving at his conclusion that Smith retains the residual functional capacity "to perform a significant range of work at all exertional levels." Id. at 14.

Smith here argues that the hearing officer failed to include all her impairments in his assessment of her residual functional capacity. Pl.'s Mem. at 17. Specifically, she asserts that the hearing officer omitted from his residual functional capacity assessment both the sedating effects of her medication, as well as her migraine headaches. Id. at 18. On this basis, Smith concludes that the hearing officer's hypothetical question to the Vocational Expert was inaccurate, and cannot constitute substantial evidence to sustain the Commissioner's burden of identifying alternative work that she can perform. Id.

The Social Security Administration has issued a policy interpretation statement regarding the assessment of a claimant's residual functional capacity. SSR 96-8p. This statement explains that a residual functional capacity assessment must be based upon all relevant evidence,[5] and that the hearing officer must "consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" Id. The statement thus instructs the hearing officer to provide a

---

[5] Under the Social Security Administration's policy interpretation statement, relevant evidence includes medical history, medical signs and laboratory findings, reports of daily activities, medical source statements, and effects of symptoms. SSR 96-8p.

narrative discussion "describing how the evidence supports each
conclusion, citing specific medical facts (e.g., laboratory
findings) and nonmedical evidence (e.g., daily activities,
observations)." Id. If, however, "there is no allegation of a
physical or mental limitation or restriction of a specific
functional capacity, and no information in the case record that
there is such a limitation or restriction, the [hearing officer]
must consider the individual to have no limitation or restriction
with respect to that functional capacity." Id.

Based upon the record before this Court, the hearing officer
was not required to include Smith's migraine headaches in his
residual functional capacity assessment. As the Commissioner
correctly points out, Smith "has made no allegations as to the
limitations imposed by her headaches." Def.'s Mem. at 18. She
merely asserts that during the months of June and July 2006, and
during three months in 2007, she suffered numerous migraine
headaches that each lasted longer than one week. Pl.'s Mem. at
18. Neither Smith's brief, nor the medical record, however,
contain any allegations as to how these migraine headaches
restricted or limited her ability to sustain gainful employment.
The hearing officer thus was entitled to conclude that Smith had
no limitation or restriction with respect to her migraine
headaches. See SSR 96-8p.

Similarly, the hearing officer was under no obligation to

21

consider the alleged side effects of Smith's medications in assessing her residual functional capacity.  Here again, Smith has alleged only that her medications have a sedating effect. Pl.'s Mem. at 18.  She offers no explanation, however, as to <u>how</u> the sedating effect of her medications interferes with her ability to sustain gainful activity.  Because Smith has failed to establish anything more than a theoretical side effect of drowsiness resulting from her medications, the hearing officer permissibly excluded this alleged impairment from his residual functional capacity assessment.

Based upon the foregoing analysis, it necessarily follows that the hearing officer's hypothetical question to the Vocational Expert accurately reflected Smith's restrictions and limitations.  Since the hearing officer was not required to consider Smith's migraines or the sedating effect of her medications in his assessment of her residual functional capacity, neither were required to be included in the hypothetical question posed to the Vocational Expert. Accordingly, this Court holds that substantial evidence supports the hearing officer's decision not to include these allegations in his hypothetical question to the Vocational Expert.

## III. CONCLUSION

For all the reasons stated above, this Court DENIES Smith's motion to reverse or remand [Doc. No. 12], and GRANTS the

Commissioner's Motion for an order affirming the decision of the hearing officer. [Doc. No. 15].  Judgment shall enter for the Commissioner.

      SO ORDERED.


                            By the Court,


                            /s/ William G. Young
                            WILLIAM G. YOUNG
                            DISTRICT JUDGE